IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

ABDUR RAZAKAH, et al.,

        Petitioners,

v.

GEORGE W. BUSH, et al.,

        Respondents.

Civil Action No. 05-CV-2370 (EGS)

---

## DECLARATION OF GITANJALI S. GUTIERREZ

I, Gitanjali S. Gutierrez, declare that the following statements are true to the best of my knowledge, information, and belief:

1. I am an attorney with the Center for Constitutional Rights, co-counsel for Petitioners Abdur Razakah and Ahmad Doe in the above-captioned action. I offer this Declaration in support of Petitioners' Petition for Writ of Habeas Corpus.

2. I met with Petitioners' Next Friend, Mr. Usama Abu Kabir, a detainee at Guantánamo Bay Naval Station, Guantánamo Bay, Cuba ("Guantánamo") on December 15, 2005, to discuss his role as a Next Friend for numerous petitioners.

3. The Department of Defense (DOD) sent my attorney notes from Guantánamo to the secure work facility for habeas counsel in Washington, D.C. I submitted the notes for review by the Privilege Team on January 12, 2006 and received my unclassified notes from the Court Security Office on January 20, 2006.

KL3:2495058.1

4. Mr. Abu Kabir is a Jordanian citizen who speaks English quite well, as well as Arabic. He has been detained in Guantánamo for almost four years. He has a fairly good understanding of our legal system and comprehends the meaning of a "next friend."

5. I asked Mr. Abu Kabir about the ability of the detainees to access the federal courts or counsel to challenge the legality of their detention and about the relationship between the prisoners.

**Inability to Access the Courts or Legal Counsel**

6. According to Mr. Abu Kabir, the detainees do not have access, much less meaningful access, to the federal courts or a lawyer to challenge the legality of their detention because (a) the prisoners do not receive the DOD notifications about habeas petitions, (b) the prisoners cannot understand the meaning of the notifications, and (c) when prisoners have contacted the court directly, they receive no response or only a response in English that they do not understand.

7. Some prisoners received the "Enemy Combatant Notification" (ECN) during the Combatant Status Review Tribunal (CSRT) process. The notice simply instructed the detainees to write the "United States District Court for the District of Columbia" to file a habeas petition and listed the court's address in Washington, D.C.

8. Mr. Abu Kabir explained that this notification was confusing for many of the prisoners. The detainees have no means to understand whether the "United States District Court for the District of Columbia" is another military or government agency affiliated with the military or whether it is an independent body.

9. He also said that while the ECN referred to a "court", the detainees were seeking an "attorney" to help them. Mr. Abu Kabir further explained that the detainees believe

KL3:2495058.1

strongly that writing the court, by itself, will not help them. The detainees want lawyers to help them present their case to the courts in an unfamiliar legal system.

10. Although the ECN states that detainees can write letters to the court, Mr. Abu Kabir stated that the prisoners did not know what to say and the ECN did not provide any information about what to write. The detainees did not know if they needed an attorney to file the petition for them. They thought that they needed a lawyer to make sure whatever letter they might write to the court was right.

11. The military police (MPs) at Guantánamo did not explain to the detainees what the ECN was. Neither could the prisoners get advice from other military people there. The 'personal representatives' were not available for this kind of advice.

12. Mr. Abu Kabir was aware of some detainees who simply mailed the entire ECN sheet itself back to the court because they did not know what else to do get legal assistance.

13. The detainees know that, in general, when they send letters in the military mail system, the letters do not arrive at the destination. Even the legal mail system established for the habeas proceedings is not reliable. Mr. Abu Kabir personally sent letters to his attorney that did not arrive. He has not received one letter from his attorney in six months even though his attorney has written to him several times. He also pointed out that the detainees must hand their own legal letters to the MPs for mailing. The detainees conclude that it is useless to send regular letters through the military to an unfamiliar court to get an attorney.

14. Mr. Abu Kabir stated that the detainees told one another of some prisoners who spoke English and wrote to the court address three or four times and never received anything back. Mr. Abu Kabir knew of no prisoner who had written to the court or who had received an attorney visit as a result of that letter, yet it has been months since those letters were

written, and in some cases almost a year. From Mr. Abu Kabir's perspective, this confirmed the futility of writing to the court address provided by the military as a means of getting legal counsel.

15. He also emphasized that the interrogators at Guantánamo were regularly "playing games" with the detainees and would say all manner of things to the detainees. Because the interrogators will "engage in nonsense" with the detainees, the detainees are suspicious of anything that comes from the military or government, including the ENC, as being simply another trick or deception. For example, when it became known that lawyers were going to come to Guantánamo, interrogators would pretend to be the lawyers, during interrogation. All of this was designed to deceive the prisoners, which makes it particularly difficult for them to trust some notice like the ECN when it comes from the military.

16. To Mr. Abu Kabir's knowledge, not all of the detainees received all of the various notifications DOD claims to have provided to the detainees. This is not simply a matter of a detainee who is confused about the different notifications. Mr. Abu Kabir is a sophisticated individual, well aware of what is happening around him. He was aware that the Catholic Workers were protesting and fasting outside the gates of the military base the week I was visiting and knows that the Associated Press is litigating a case seeking the CSRT records.

17. Yet, Mr. Abu Kabir could not remember ever having seen or heard of the American Bar Association (ABA) notification informing detainees that the ABA could help them secure lawyers.

18. The ECNs were not translated into enough languages. If a detainee was illiterate, he would need to ask another detainee to read the notification to him, if he was in a camp where this was even possible. The MPs were prohibited from helping the detainees with

KL3:2495058.1

any legal or other questions about the notification. The ECN in Arabic was much more difficult to understand. While he is sophisticated, and was able to read the ECN in both English and Arabic, Mr. Abu Kabir did not understand what a petition for habeas corpus was until he talked to his own lawyer.

19. Mr. Abu Kabir does not understand why there is any problem with his acting as a "next friend." He and his lawyer talked this over, and discussed the fact that the ECN says right on its face that a prisoner can as any "friend" to file a petition for him. That much of the ECN seemed very clear. Mr. Abu Kabir felt that he could help people who he knew wanted lawyers in this way, and does not understand why the Government would not allow something that they specifically said he could do.

20. Indeed, the detainees would wait until one detainee with a lawyer had an attorney-client meeting and the entire group would send their questions with that detainee to ask his lawyer. Mr. Abu Kabir trusted his lawyer, and consequently the other prisoners trusted him (Mr. Abu Kabir) to seek help through his lawyer.

**Close Relationship Between the Detainees**

21. Before discussing the relationship between the detainees, Mr. Abu Kabir provided three specific reasons why it is difficult for the detainees to have family members acting as next friends, thus creating the need for a fellow detainee to act of a person's behalf.

22. First, Petitioners Razakah and Ahmad and many other Uighur detainees have specifically expressed that they do not want their families to be contacted about becoming next friends because they fear the Chinese government becoming aware of and persecuting their families. This leaves the men with no other recourse other than to turn to fellow detainees for assistance.

KL3:2495058.1

-5-

23. Second, the detainees know that only U.S. lawyers can meet with them at the base. Most of the detainees left at Guantánamo are from Arab countries. The prisoners cannot fathom how their families could possibly contact an American lawyer to help them. And even if their families did, the detainees and their families would face language and other barriers with these lawyers. The detainees cannot imagine how their families are supposed to deal with this.

24. Finally, after years of interrogation, some detainees are very concerned about the interrogators reading their letters. Every letter a detainee sends through the regular mail system is reviewed and censored by the military. According to Mr. Abu Kabir, if the interrogators review and censor these letters, they will see the detainee asking for legal assistance. Some of the detainees conclude from this that the interrogators will believe the detainee is hiding something and interrogate him more aggressively. They believe that interrogators will think that the detainee has done something wrong if he is asking for the help of a lawyer.

25. Mr. Abur Kabir consistently described the relationship between himself and the other detainees as being one of the closest relationships he had experienced in his life.

26. In general, as Muslim men, the detainees have their religious community, which is as strong as biological relatives. Some men from the same region also have tribal or regional bonds from their home countries prior to imprisonment.

27. In Guantánamo in particular, the relationship between the detainees is extremely strong. Mr. Abu Kabir described it as being as strong as, if not at times stronger, than his relationship with this father or actual brother.

KL3:2495058.1

28. As described in Brent Mickum's declaration in *Al-Razak v. Bush*, 05-CV-01601 (GK) (D.D.C.), some of the detainees expose themselves to retaliation by acting as a next friend to help a fellow detainee.

29. Finally, Mr. Abu Kabir explained that the DOD has moved some of the prisoners who asked him to act as a next friend. This can make is impossible to communicate with them once they are separated. Because the next friend authorizations were given such a long time ago, by the time an attorney finally can schedule a client meeting, the two detainees have been moved apart.

30. Mr. Abu Kabir made clear, however, that the geographical separation between the detainees when DOD transferred one of them to a different cell block cannot weaken or undermine the strength of the relationship and his personal commitment to acting in his friend's best interest.

31. I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 3 day of February, 2006 in New York, New York.

_____
Gitanjali S. Gutierrez